IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 10-489-2 |
| | : | |
| AARON SMITH | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                               **November 3, 2011**

Defendant Aaron Smith is charged with several offenses based on his alleged involvement in an armed robbery of the Fox & Hound Smokehouse & Tavern (Tavern) in Philadelphia on October 27, 2008. Smith asks this Court to suppress (1) his out-of-court photographic identification by witness Tyrone Jenkins in February 2011, and (2) any in-court identification of him by Jenkins or the other two Tavern employees who were present at the time of the robbery, Valynn Barfield and Leonard Lowe. The Government does not oppose Smith's motion as to Barfield and Lowe, from whom it does not intend to elicit an identification of Smith at trial. *See* Gov't's Omnibus Resp. to Defs.' Pretrial Mots. 5-6. Because Jenkins's photographic identification of Smith was not the result of an unnecessarily suggestive identification procedure, the motion is denied as to Jenkins.

**FACTS**[1]

1.     On October 27, 2008, the date of the robbery, Jenkins worked as a cook at the Tavern.

2.     Around 10:00 a.m., while Jenkins was in the back of the Tavern preparing for the day, two men entered the restaurant, which was not yet open. The hostess (Barfield) and the manager (Lowe) were also in the Tavern at the time.

---

[1] The following facts are based on the testimony of Tyrone Jenkins and FBI Special Agent Steven McQueen at the August 2, 2011, hearing on Smith's suppression motion and the exhibits introduced at the hearing.

3.      Jenkins, who had gone into the front of the Tavern to speak with Barfield, saw the two men standing in the customer area of the restaurant and approached them.  The men told Jenkins they were there to fill out an application and had been told to ask for Sean or Lenny (i.e., Lowe).  Jenkins said he would go get Lowe.

4.      During this initial interaction, Jenkins saw the men from a distance of 15 to 20 feet.  Some of the lights were on in the portion of the Tavern where the men were standing, and there was also light coming in through the Tavern's glass walls.  Jenkins observed that one of the men was about 6'4" tall, and the other was about 5'8" or 5'9".  Both were wearing tan or khaki-colored clothing.  As Jenkins approached the men, his attention was focused on the voice of the taller man, who had spoken first, but Jenkins could see both men.

5.      Jenkins went back into the kitchen and told Lowe two men had asked for him and wanted to fill out applications.  Jenkins then stayed in the back of the restaurant while Lowe went out to talk to the men.

6.      Within two to three minutes, Jenkins saw Lowe struggling with the taller of the two men and thought the Tavern was being robbed.  When Lowe stopped struggling, the taller of the two men pushed Lowe toward the Tavern's office, passing by Jenkins.

7.      Seconds later, the shorter of the two men came toward Jenkins with Barfield, whom the shorter man was pushing from behind toward the office.  The shorter man said "come on," grabbed Jenkins by the arm, and gestured him toward the office as well.

8.      The shorter man forced Jenkins and Barfield into the office and told them to lie face down on the ground with their hands behind their backs.  Jenkins, peeking up at the robber from his position on the ground, saw the shorter man tape Barfield's feet, then her hands, with duct tape.

Jenkins was able to see the shorter man's face from where he was lying. The shorter man then taped Jenkins's hands and feet with duct tape.

9. While the shorter man was taping Barfield and Jenkins, the taller man directed Lowe to open the safe. The taller man then proceeded to empty the safe while the shorter man duct-taped Lowe on the ground next to Jenkins. Jenkins was able to see both the taller man's and the shorter man's faces during this time. At some point while he was on the ground in the office, Jenkins noticed that the taller man had a black pistol, causing him to fear for his life.

10. During the robbery, a beer delivery person entered the Tavern. He, too, was ordered into the office, where he was also duct-taped on the ground by the shorter of the two robbers.

11. After the beer delivery person was taped, the taller man finished clearing out the safe, and Jenkins watched the two men leave the office. Jenkins estimated he was in the office for about 10 minutes during the robbery.

12. Shortly thereafter, the employees and the beer delivery person freed themselves from the duct tape and called the police, who arrived at the Tavern and interviewed the witnesses.

13. Jenkins provided his account of what had happened during the robbery, and then responded to questions from the police. When asked whether he would be able to identify the robbers from a photo, Jenkins responded, "not off hand, I couldn't." Gov't's Ex. 1 at 2. Jenkins gave this response because he was nervous, not because he did not get a good look at the men.

14. Jenkins then proceeded to describe the taller of the men as "about 6'5", 285 to 300 lbs, wearing a beard the Sunni a Muslim type of beard," and noted both men "had on the same beige clothing." *Id.* When asked what the shorter man looked like, Jenkins stated, "we really couldn't see him because we were face down," *id.*, by which Jenkins explained he meant that he was unable to

provide the same level of detail regarding the shorter man as he provided regarding the taller man.[2]

15. The day after the robbery Jenkins met with detectives and identified the taller of the two robbers from a photographic array. Barfield and Lowe also identified the taller robber, who was thereafter arrested, charged, and convicted of the robbery pursuant to a guilty plea.

16. Jenkins did not look at any additional photographs in connection with the robbery investigation until February 11, 2011, when he met with FBI Special Agent Steven McQueen.

17. When Agent McQueen called Jenkins to arrange the meeting, he told Jenkins he had another lineup of photographs he wanted Jenkins to review. He also told Jenkins he wanted to get a DNA sample. Although Jenkins could not remember exactly what Agent McQueen said to him, he recalled McQueen used the word "suspects" in telling him about the array he wanted Jenkins to review.

18. Prior to meeting with Jenkins on February 11, Agent McQueen prepared a photographic array containing a photograph of Smith, whom investigators had recently identified as a possible suspect. Agent McQueen prepared the array by obtaining a photograph of Smith from the Philadelphia police arrest database and using a program within the database to select photographs of seven other individuals closely resembling Smith in age, skin tone, facial features, and hair. In preparing the array, Agent McQueen used a photograph of Smith from September 2008, which was the photograph of Smith in the database closest in time to the October 2008 robbery.

19. On February 11, Agent McQueen and his partner met with Jenkins at Jenkins's home. Agent McQueen first asked Jenkins to recall the robbery in order to refresh his memory. After hearing

---

[2] Although Jenkins did not provide a description of the shorter of the two robbers to the police, at the suppression hearing, he described the shorter man as being about 5'8" or 5'9" and about 189 pounds, with a medium build, light skin, and facial hair on the sides of his face.

Jenkins's account, which was consistent with his statement to the police the day of the robbery, Agent McQueen asked Jenkins whether he recalled making an identification the day after the robbery, and showed him the lineup in which he had identified the taller robber.

20. Agent McQueen then told Jenkins he had another array to show him. McQueen explained the other robber was not necessarily in the array, but he wanted Jenkins to look at the array and tell him whether Jenkins recognized anyone in it and how. Agent McQueen further explained Jenkins was under no obligation to pick anyone, and it was fine if he could not identify anyone. Consistent with his training and standard practice, McQueen told Jenkins to concentrate on his memory and on the features of the face that do not change, such as the eyes, nose, and ears.

21. Agent McQueen then placed the array, which contained eight photographs arranged in two rows of four photographs each, on the table in front of Jenkins. After looking at the array for a short time, Jenkins identified the second photograph from the left in the bottom row (i.e., Smith's photograph) as the shorter man who duct-taped him at the Tavern on October 27, 2008. Agent McQueen instructed Jenkins if he was sure of his identification, he should circle the photograph and place his signature and the date underneath, and Jenkins did so.

22. After Jenkins made the identification, Agent McQueen turned the array over to make room for the other items he had brought with him. A few seconds later, Jenkins asked McQueen if he could see the array one more time to make sure he had made the right identification. Agent McQueen turned the array back over, and Jenkins confirmed he was positive of his identification. Jenkins testified he was absolutely certain the person in the photograph was the shorter man and stated there was no doubt in his mind.

23. When showing Jenkins the photographic array, Agent McQueen did not at any time suggest

or tell Jenkins whom to select. Jenkins did not feel the shorter robber must have been in the array, and he stated he would not have selected anyone from the array if the person was not the shorter robber.

24.  After Jenkins confirmed his identification, Agent McQueen proceeded to take a DNA swab from Jenkins's cheek for comparative purposes.

**DISCUSSION**

"[E]vidence of a pretrial photographic identification is inadmissible 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification.'" *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The same standard governs the admissibility of an in-court identification in the wake of an allegedly suggestive out-of-court identification. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972) (noting the "standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification . . . serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself"); *Stevens*, 935 F.2d at 1389 n.9 (same).

In evaluating the admissibility of such identification evidence, a court conducts a two-step inquiry. "The first question is whether the initial identification procedure was 'unnecessarily' . . . suggestive," which entails consideration of (1) whether the identification was suggestive, and (2) whether there was "some good reason for the failure to resort to less suggestive procedures." *Id.* at 1389 (citation and emphasis omitted). The burden is on the defendant to prove the identification was unnecessarily suggestive. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). "If a procedure is found to have been unnecessarily suggestive, the next question is whether the procedure

6

was so conducive to mistaken identification or gave rise to such a substantial likelihood of misidentification that admitting the identification would be a denial of due process." *Stevens*, 935 F.2d at 1389 (internal quotation marks and ellipses omitted). This second step requires a determination whether an identification that resulted from an unnecessarily suggestive procedure is nevertheless reliable under the totality of the circumstances, including the witness's opportunity to view the criminal at the time of the crime, his degree of attention, the accuracy of his prior description of the criminal, his level of certainty at the confrontation, and the length of time between the crime and the confrontation. *See Biggers*, 409 U.S. at 199-200.

      Here, Smith does not argue the composition of the array was suggestive, much less unduly so. Smith does not challenge the number of photographs included in the array, nor does he identify any way in which his photograph stood out from the others. Rather, in his motion, Smith concedes the Third Circuit has upheld photo arrays containing even fewer than eight photographs. Def.'s Mem. 3 (citing *Lawrence*, 349 F.3d at 115, in which the Third Circuit upheld the use of an array consisting of six photographs reproduced on a single page). Moreover, at the suppression hearing, Smith conceded the array was not suggestive in and of itself. Having reviewed the array, which contains eight photographs of African-American men of similar age with similar facial characteristics and hair patterns, this Court agrees and finds the array was not unduly suggestive.

      Smith instead argues the procedure employed in showing the array to Jenkins was suggestive because (1) Agent McQueen used the term "suspects" in telling Jenkins he had another array of photographs he wanted Jenkins to review, (2) McQueen told Jenkins to focus on the features of the face that do not change, such as the eyes, nose, and ears, in reviewing the array, (3) Jenkins asked to see the array a second time after identifying Smith's photograph, demonstrating some uncertainty

about Jenkins's initial identification, and (4) the identification occurred almost 28 months after the robbery.  None of these arguments has merit.

As to the first argument, there is no evidence Jenkins felt any pressure to identify anyone in the array—much less any particular person in the array—because of Agent McQueen's use of the term "suspects."  To the contrary, Jenkins testified he did not feel the shorter robber must have been in the array McQueen presented to him, and stated he would not have selected anyone from the array if the person was not the shorter robber.  Moreover, when showing Jenkins the array, Agent McQueen told him the shorter robber was not necessarily in the array and explained Jenkins was under no obligation to select anyone.  In these circumstances, Agent McQueen's reference to "suspects" does not render the identification procedure suggestive.  *See United States v. McNeill*, No. 06-373, 2007 WL 2234516, at *5 (W.D. Pa. Aug. 2, 2007) (holding the fact police told a witness they had a suspect whose photograph was contained in a photo array did not render the identification procedure unduly suggestive where there was no indication the officers who conducted the array attempted to emphasize any one particular photograph or suggest who they considered to be a suspect, and no indication the witness felt any pressure to identify anyone), *aff'd on other grounds*, 360 F. App'x 363 (3d Cir. 2010); *cf. United States v. Ladson*, 238 F. App'x 874, 877 (3d Cir. 2007) (holding a police officer's identification of a defendant from a police flyer which mentioned the defendant by name and stated he was a suspect in a robbery was not the result of an unnecessarily suggestive identification procedure where the flyer included photographs of four suspects and did not indicate which one depicted the defendant).

Agent McQueen's statement that Jenkins should focus on the features of the face that do not change also does not render the array suggestive.  Although Smith argues this instruction affects the

8


integrity of the identification by telling the witness how to make an identification, he offers no explanation how this instruction would have steered Jenkins toward any particular photograph in the array or why it was otherwise improper. Courts have found similar instructions by investigating agents not suggestive. *See United States v. Whitehead*, 257 F. App'x 777, 783 (5th Cir. 2007) (holding that instructing witnesses viewing a photographic lineup "not to focus on aspects of a person's appearance that are susceptible to change, such as hairstyle and facial hair, but rather to focus on unchangeable features such as 'their ears, their eyes, [and] their nose'" was not suggestive); *United States v. Lawson*, 410 F.3d 735, 739 (D.C. Cir. 2005) (rejecting a defendant's argument that a photographic array was suggestive based on slight differences between his appearance and that of others in the array and noting the agent had given the witness "a standard admonishment in advance of showing her the array, including a warning that 'photographs may not always depict the true complexion of a person' and that such complexion 'may be lighter or darker than shown in the photo'" (citation omitted)). The same is true here.

  As to the remaining factors Smith identifies—the approximately 28-month delay between the robbery and Jenkins's identification, as well Jenkins's request to view the array a second time—while these factors are certainly relevant to the reliability of Jenkins's identification,[3] they do not establish the identification procedure was suggestive in any way. There is no indication, for example, that Agent McQueen prevented or attempted to dissuade Jenkins from viewing the array a second time. Rather, both Jenkins and Agent McQueen testified that when Jenkins requested to see the array again within seconds after making an identification, McQueen turned the array back

---

[3] *See Biggers*, 409 U.S. at 199-200 (holding the factors to be considered in evaluating the reliability of an identification include "the level of certainty demonstrated by the witness at the confrontation" and "the length of time between the crime and the confrontation").

over and Jenkins confirmed his identification.

Because Smith has not met his burden to show the identification procedure employed in this case was unnecessarily suggestive, this Court need not proceed to the second step of the two-part inquiry, which entails an evaluation of the reliability of the identification based on the factors set forth in *Neil v. Biggers*. *See United States v. Foote*, No. 09-2931, 2011 WL 2489904, at *3 & n.4 (3d Cir. June 23, 2011) (upholding the denial of a motion to suppress a pretrial identification of a robbery suspect made two years after the robbery without considering the reliability of the identification where the defendant failed to demonstrate the photographic array was unduly suggestive); *United States v. Mathis*, 264 F.3d 321, 331 (3d Cir. 2001) (affirming the denial of a defendant's motion to exclude identification testimony based solely on the defendant's failure to show the photographic identification was unnecessarily suggestive without addressing the reliability of the identification); *see also Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) (holding if identification procedures were not suggestive, "the identification evidence presents no due process obstacle to admissibility; no further inquiry by the court is required, and the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury" (citation omitted)).

**CONCLUSIONS OF LAW**

The identification procedure pursuant to which Jenkins identified Smith's photograph was not unnecessarily suggestive; therefore, Jenkins's identification of Smith will not be suppressed.

For the reasons set forth above, Smith's motion to suppress Jenkins's identification of him is denied. An appropriate Order follows.

BY THE COURT:


   /s/ Juan R. Sánchez
Juan R. Sánchez, J.